Wright, J.
The first lot of peaches, shipped on the 11th of September, Friday, reached Buffalo so as to leave that point Saturday night, the 12th, arriving at Htica three o’clock Sunday morning. Here the car was stopped by the railroad company, as no means could be found to get around the break, which was twenty-eight miles further on. Dpon the evidence we do not think the express company can be charged with a want of diligence in failing to get their freight past the obstruction. They seem to have used every exertion in their power to discharge their duty in this behalf. In order to get the goods over the break, it was necessary to wagon them about a mile and a quarter. As soon as the agents of the express company heard of the accident they repaired to the spot, and endeavored to forward their merchandise. They attempted to hire wagons, but the railroad company had anticipated them, and engaged all the teams and vehicles that could be found in the country, for the purpose of transporting passengers and their baggage. It was, therefore, not until Tuesday, the 15th, that any facilities of the kind could be had, and then the company began the movement of express stuff, but this was too late, as far as the peaches were concerned. Nor *518 was the express company in fault in the matter of the falling of the bridge, as is claimed. And for the purposes of this case it may' be conceded that the express company is responsible for the default or negligence of the railroad company, if any there be.
The railroad company were about removing an old bridge at East Canada creek, for the purpose of building a new one of iron. As a temporary matter, a number of bents were put under the old bridge, to strengthen it. There then came a heavy rain; the testimony shows it to have been of unusual violeuce. The water rose rapidly, broke away dams, and carrying down logs and drift against the bridge, swept it off.
The evidence leaves it beyond a doubt that the storm and the freshet were altogether beyond any thing of an ordinary character, and responsibility for this can not be charged upon the railroad company. Nor can we find any fault in the railroad company in not repairing the damage sooner than was done, as would have been the case under ordinary circumstances. It is shown to be well provided against disasters of this kind. ■ Duplicate bridges are kept on hand all the time, and as a general thing a bridge can be replaced in from six to twelve hoars. TJpon this occasion, however, it was long before the water in the stream resumed its natural level, and this delayed the operations of the bridge builder’s.
But it is said that the express company, as soon as they heard of the break, should have diverted the peaches by some other route, so as to have gotten them to New York more speedily. It seems there was a route from Buffalo to New York, over the New York and Erie Railroad, upon which the United States Express Company ran ; and it is also said that the peaches might have been brought from Utica back to Syracuse, and then delivered to the United States Express Company and shipped to New York by way of Binghampton; and again, that the peaches might have been delivered at Columbus, Ohio, and so have gone to New York by the Pennsylvania Central.
*519 As to this last suggestion, the last lot of peaches left Fort Ancient at 6:20 Saturday night, and probably reached Columbus not far from the time the bridge was swept away, and there is nothing to show that the disaster was known at Columbus before the peaches reached there, so as to make the diversion a profitable thing.
As to bringing them back to Syracuse, this would have required a cartage at that point of about three-quarters of a mile, forty-eight hours to reach New York, and cartage again at Jersey City and ferriage across the river, all of which would almost certainly have involved a total destruction of the fruit, from the condition they were in, as will be hereafter seen.
As to diverting them at Buffalo. The first lot of eight bushels passed that point, leaving there at 6 p. m., three hours before the break. There can, therefore, be no possible reason for saying they should have been diverted there, as suggested. The other two lots left Buffalo during Monday. The United States Express Company, which ran from that point to New York, was a rival route, and there is no certainty it would have taken the property, which was perishable in its nature and already perishing in its condition. A re-shipment would have involved delay, and such delay, as seems to us, would have been destructive.
Under ordinary circumstances this bridge might, and probably would, have been repaired in six hours, and travel resumed; it was fair for the express company to assume that this would be done, as doubtless would have been, had the water gone down at any usual rate, and they can not be said to have béen in fault in not anticipating what perhaps nobody thought was a probable or possible event.
There is an ex post facto wisdom, which, after every thing has been done, without success, can suggest that something else should have been attempted, but this is a sagacity much more astute than ordinary human foresight, and can hardly furnish a fair rule by which to determine the pro *520 priety of what has been done in good faith, and with judgment exercised under the best lights affoided.
Had the plan suggested been in fact pursued, and the peaches transhipped either by way of Syracuse or Buffalo, the delay which would have ensued, together with the rough jolting attendant upon the necessary cartage, would, as it seems to us, have ensured their entire destruction. Thereupon the shippers might, with much force of argument, have said, we shipped by your route, and you had no right to make a deviation ; by so doing you subjected our property to unusual delays and risks not contemplated, and loss having ensued, you are responsible. You should have gotten it around the break with all speed, or if that were impossible, you should have sold it to the best advantage, instead of taking a course which must have necessarily led to its entire loss.
But in our view of the facts, this loss was occasioned by the condition of the property at least as much as from any other cause. These peaches were picked and shipped on Friday and Saturday, the 11th and 12th of September. The overwhelming testimony is that the weather of that week was most destructive upon this kind of fruit. It was damp, rainy, warm, and murky up to Thursday night, Friday being bright, warm, and sunny. The effect of this temperature is described by the man who shipped the peaches as having a peculiar effect upon them. They rotted rapidly. An apparently sound peach would rot in twenty-four hours. A speck on a peach would, in a few hours, develop into rot. He says the week ending September 12th was the most disastrous he ever saw. There is no controversy at all about the condition of the weather, and of its being exactly that kind that would destroy peaches in a very short time.
The first lot, shipped Friday, was to have reached New York for Monday’s market, and could not have reached there earlier. They were stopped at the break, and the express agent at once concluded they ought to be sold. They were sold. This was on Sunday, before, it will be *521 observed, they could by any possibility have reached New York, had they gone straight on without any break. "What was their condition then ? If spoiled and worthless, or nearly so, in Utica, could they have been any better in New York ten or twenty hours later in point of time? The express agent went to a fruit dealer in Utica to get him to buy the articles. The dealer went to see the peaches Sunday, and told the agent he would take them, if they were unloaded that night so as to get air, otherwise he would not take them on any condition. This dealer, who is a witness, describes Friday and Saturday as having been hot, sultry, rainy days — the worst kind of weather for fruit. He was on the car in which the peaches were, and says it was so close and sultry that it was very unpleasant to remain in it; that the condition of the weather was such that had they gone straight through, they would have been worthless upon reaching New York. He examined them Monday, after they had been unloaded and given air, and none of them were sound. There is much testimony of this kind, all tending to show the unfavorable condition of the weather, that the car had been close and hot, that it was wet with moisture and vapor arising from the fruit, which had become heated and in such condition as to be past saving before it could have reached New York in the ordinary time. It therefore seems to us that the best thing to do under the circumstances was that which was done — namely, to sell the stuff at once. The express company did get one lot to Albany, but were compelled to sell them there.
These remarks as to the condition of the fruit apply to all the various lots. When they reached Utica, the testimony is without contradiction that they were in such plight that they could not have been got to New York in any way, or by any route, so as that they would at all have been marketable.
"We have not gone into the evidence in extenso, but these conclusions are abundantly supported by it. We therefore feel bound to say that the loss of the peacnes was occa *522 sioued, not by any fault or negligence of the express company, but by the perishable nature of the article, in connection with the condition of the weather; and the delay which occurred at the break was something for which the express company was not responsible.
The jury, however, proceeded to render a verdict, an analysis of which shows that it was predicated upon the idea of the peaches reaching New York in a perfectly sound condition, as it is based upon the highest market price; it being at the same time perfectly apparent that had there been no break, the peaches could not have reached New York in a sound condition.
Among other things the court charged the jury:
“ Rut if the defendant was prevented from sending them by that route in consequence of the washing away of a bridge, which did not happen through the negligence of the railroad company or the defendant, then it was the duty of the defendant, after first ascertaining that it could not send forward the peaches by that route, so as to get them to New York city in time to preserve them, to use ordinary care and diligence to employ some other safe and reliable route or agency, or express company, if such was then known and available to the defendant, by which the peaches could be carried through to New York city in time to save them.”
This was misleading, in that it drops out of view’ the actual condition of the peaches at the time when they ought to have been sent forward upon this supposititious other route. Clearly, if they were rotten and entirely worthless upon reaching the point where this transhipment could have been made, there would have been no sense in sending them on. The jury should have been told to take into view the circumstances as they actually were — the condition of the weather and of the fruit — and under proper instructions should have determined whether the company were bound to seek some other route for transportation.
In the view, however, that we take of the evidence, *523 plaintiffs made no case for recovery, and the judgment should be reversed.

Judgment reversed,.